Argued February 21; decided March 14, 1898.

### KADDERLY *v.* COUNTY COURT.

[52 Pac. 515.]

FERRIES — COUNTIES. — The duty enjoined upon the county court of Multnomah County by the act of 1895, to maintain and operate the Stark Street Ferry, does not require or authorize the court to buy or build a new boat to replace the one in use when the ferry was purchased.

From Multnomah: E. D. SHATTUCK, Judge.

Mandamus proceeding by James J. Kadderly and others to compel the county court of Multnomah County to operate a certain ferry. Plaintiffs appeal from a judgment for defendants.

AFFIRMED.

For appellants there was a brief over the names of *Robert G. Morrow* and *Edward Mendenhall*, with an oral argument by *Mr. Cicero M. Idleman*.

For respondents there was a brief over the names of *Bronaugh, McArthur, Fenton & Bronaugh; Dolph, Mallory & Simon, John H. Hall* and *Wilson T. Hume*, district attorney, with an oral argument by *Messrs. Rufus Mallory* and *William D. Fenton*.

MR. JUSTICE WOLVERTON delivered the opinion.

This is a proceeding by mandamus to compel the County Court of Multnomah County, Oregon, to maintain and operate what is known as the "Stark Street Ferry," in the City of Portland, in accordance with the requirements of an act of the legislative assembly approved February 21, 1895, relating to the acquirement by the City of Portland of certain bridges and ferries across the Willamette River at said city, and the maintenance and operation of the same by the county court of said county. It appears that the boats turned over to the county court under the provisions of said act have become rotten and worthless for any purpose, and by reason thereof have been dismantled and the hulls abandoned, so that the county is without a boat fit or suitable for service in the operation of said ferry. The primordial and vital inquiry is whether, by the provisions of said act, the county court is required to reconstruct or rebuild such boats, or either of them, or otherwise acquire a boat suitable for such purpose, and to operate the same as a ferry at the point designated. A brief reference to the former legislation leading up to the act in question will enable us to indicate more clearly the views we entertain touching the controversy.

In 1891, before the consolidation of the three cities, an act was passed to authorize the cities of Portland, East Portland and Albina to purchase or acquire, by condemnation or other means, one or more bridges across the Willamette River between the cities of Portland and East Portland, the same to be free, except

for railway and street cars: Session Laws, 1891, 633. By the act it was provided that the power and authority given the cities named for the acquirement of such bridge or bridges should be exercised by a "bridge committee," therein designated, which committee was empowered to issue bonds, not to exceed $500,000, for the purpose of raising the necessary funds; that "whenever, and as soon as the several bridges herein provided to be procured, in the judgment of the committee, have been constructed, purchased or hired, and are all ready for use or the limit of the sum of money hereby authorized to be expended has been reached, there shall be selected, as herein provided, four persons for the purpose of maintaining, managing and keeping in repair said bridges, who shall be styled * * * the 'bridge commission,' * * * and thereafter the power and authority given to said cities to construct, purchase and hire one or more bridges shall be exercised as hereinafter provided by said commission" (section 15); that when the "commission" is elected and organized, the "committee" shall turn over "the said bridges" to it, and that it shall thereupon "take possession and charge of and manage, conduct and maintain the same" (section 18). By section 20 the commission is required annually, before the first day of January, to make a written estimate of the probable expense of maintaining and keeping in good condition of repair during the ensuing year the bridges so constructed, hired and purchased, also the cost of contemplated alterations and improvements, and it directs how the aggregate sum, together with one year's interest on the bonds, shall be pro-

vided for by taxes apportioned to the three cities, and levied and collected by them. After 10 years a sum, in addition to the foregoing, equal to one twentieth of the bonds issued, is required to be raised by taxation for the purpose of redeeming such bonds. By an act of the legislature approved February 22, 1893, the commission was authorized and empowered to purchase, condemn, establish, maintain and operate a free public ferry at or near Knight or Quimby streets in the City of Portland, and to this end was authorized to issue $50,000 additional bonds: Session Laws, 1893, 799.

The act of 1895, upon the construction of which depend the issues of the case at bar, is an act to authorize the City of Portland to acquire, by purchase or condemnation, the Morrison Street Bridge and the Stark Street Ferry; to lease the upper deck of the steel bridge, and to repeal the two former acts above alluded to: Session Laws, 1895, 421. This act created a special "bridge committee," which was empowered to purchase and lease, in the name of the City of Portland, the bridges and ferries named in the title; and for the purpose of carrying the provisions of the act into effect the committee was authorized to issue bonds in the name of the city to an amount not exceeding $200,000. Section 16 provides that "whenever, and as soon as, the bridge committee has secured all of the bridges and ferry, which they shall acquire under this act, and the same are ready for use, the bridge committee is hereby required to turn the same over to the County Court of Multnomah County, which is hereby required to accept and receive the same and operate

the same as free bridges and ferry, and operate the same under similar conditions to those under which the other free bridges and ferries belonging to said City of Portland are operated, and which free bridges and ferries now, heretofore and hereafter belonging to said City of Portland, are by this act placed under the jurisdiction and control of the said County Court of Multnomah County." Section 27 provides that, as soon as the act shall take effect, the "bridge commission" selected under the act of 1891 shall relinquish all authority and right in and over, and shall transfer and deliver to the County Court of Multnomah County the complete possession and control of all the bridges and ferries now owned and operated by the City of Portland and over which said "bridge commission" has any power or authority; and from and after the taking effect of the act the county court is required to "assume and take complete possession and control of all the bridges and ferries now owned and operated by the said City of Portland or which may be acquired under the provisions of this act, and said County Court of Multnomah County shall maintain and operate the same." By section 26 the county court is required to make an annual tax levy sufficient to pay the interest upon the bonds provided for, to maintain and keep in good condition and repair during the ensuing year all such bridges and ferries and to pay the rental upon the upper deck of the steel bridge, and after the expiration of 10 years to levy an additional tax equal to one twentieth of the whole amount of the bonds issued

under the several acts alluded to for the redemption of such bonds.

It may be observed, at the outset, that the bridges and ferries, the acquirement of which was provided for by said acts, are the property of the City of Portland; that while, by the terms of the latter act, the management and control thereof are transferred to the County Court of Multnomah County, which is required to maintain and operate them, yet it acquired no property rights therein. The legislature, by special grants of power, authorized the construction and purchase of such bridges and ferries, and when the authority thus granted had been exercised in each instance, through whatsoever instrumentality employed, there was an end of the delegated power, and no other bridges or ferries could have been constructed or purchased by the city or cities concerned. The power to maintain, manage and keep in repair was continuing in its nature, and is an authorization distinct from the special grants of authority just alluded to. The duty was, by the act of 1891, cast upon the "bridge commission," and by the act of 1895 transferred to the County Court of Multnomah County. While the commission was authorized by the act of 1893 to purchase or condemn the ferry at or near Quimby street, and may have succeeded, under the act of 1891, to the power and authority to construct, purchase and hire, yet these were special grants of power, and, when the purposes thereof were conserved, the authority of the commission was at an end. So with the special bridge committee named in the act of 1895. It was empowered to do three things: To purchase or condemn

the Morrison Street Bridge; to purchase or condemn the Stark Street Ferry, and to lease the upper deck of the steel bridge. And when this was accomplished its mission was fulfilled. Henceforth the County Court of Multnomah County was required to assume the management and control of such bridges and ferry, and also to take and assume the management and control of the bridges and ferry which had been previously constructed or purchased, and along with these requirements the duty to maintain and operate all these bridges and ferries was devolved upon said county court. It thus becomes apparent, from the general policy of the legislation as manifested by these several acts touching the acquirement, management, control and operation of the bridges and ferries concerned, that the powers granted to construct, purchase or hire were distinct from the authority given to manage, control and operate, and that the latter authority by no means included or comprised the first.

As it regards the bridges and ferry latterly acquired under the act of 1895, the county court was required to accept and receive the same, and to operate them as free bridges and ferry, under similar conditions to those under which the other free bridges and ferries belonging to the City of Portland were operated. It is clear that the bridge commission, under the authority given it to operate, had no power to build, construct or purchase. And this elucidates the authority which it was intended that the county court should exercise respecting all these bridges and ferries; that is to say, it shall operate the same as those formerly under the control of said commission were operated.

Hence, we think it was not intended that the county court should maintain and operate such bridges and ferries, under the general statutes regulating the construction and maintenance of bridges and ferries by that tribunal, but that it should be governed by the provisions and regulations of the special act of 1895, requiring it to receive and assume the management and control of such bridges and ferries. Some stress is put upon the word "maintain," and it is thought that it is broad enough to require the county to rebuild or reconstruct, or to supply the necessary instrumentalities to keep such bridges and ferries in operation. But we think its significance here is the ordinary one, — "to keep up, sustain, preserve": Anderson's Law Dictionary. The purport of the language is "to maintain, manage, keep in repair." This is not broad enough to include or comprise a complete rebuilding or reconstruction of a bridge or a boat, or to replace either with an entirely new one after the old had fallen into decay or had been destroyed. In the case of *Simon* v. *Northup*, 27 Or. 487 (40 Pac. 560), it was decided that the debt incurred for the construction and procurement of these bridges and ferries could not be transferred from the city, and imposed upon the county, but that it should be required to assume the control, and manage and operate them, and to incur and defray the expense incident thereto. But the power to rebuild or reconstruct is not an incident of the duty imposed upon the county to maintain and operate. In this view, the mandamus proceedings to require the county court to reconstruct, purchase or otherwise acquire a new

ferryboat, with which to operate Stark Street Ferry, cannot be sustained, and the judgment of the court below will therefore be affirmed.

AFFIRMED.