# Richmond.

## The Chesapeake and Ohio Railway Company v. Williams Slate Company.

October 1, 1925.

Absent, Christian, J.

1. SPECIFIC PERFORMANCE—*Letter as Contract—Letter a Written Memorandum of a Previous Verbal Agreement—Case at Bar.*—In the instant case, a suit for specific performance, defendant claimed that a certain letter did not constitute a contract, and, therefore, there could be no specific enforcement thereof. The letter in question was not an offer to negotiate or proposal for acceptance, but a written memorandum of a previous verbal agreement and did not require an acceptance in order to give it the effect which its terms import, and the request for the return of the letter, contained therein, was manifestly for the purpose of reducing the agreement to a more formal indenture. The letter was treated by all the parties as embodying the agreement previously reached in their conferences, and this agreement can be specifically enforced.

2. CONTRACTS—*Binding Contract—More Formal Contract to be Prepared.*—If the parties are fully agreed there is a binding contract notwithstanding the fact that a formal contract is to be prepared and signed, but the parties must be fully agreed and must intend to be bound.

3. RAILROADS—*Right of Way—Title to Right of Way—Permission of Landowners—Case at Bar.*—In the instant case, the manner in which a right of way over quarry lands was used and employed by both the railroad and the landowner, furnished convincing evidence that the railroad never asserted ownership of the 100-foot right of way, but enjoyed an easement only over the property as defined in a letter from the engineer of the railroad's predecessor to the landowner's predecessor in title. The railroad allowed slate to be quarried to within four feet of its cross ties. The surveys made by the railroad showed no title to the right of way, and when first demand was made by the landowner for the removal of the tracks, the railroad, instead of denying the right of the landowner, had its engineer make surveys looking to removal.

4. SPECIFIC PERFORMANCE—*Description of the Property—Case at Bar.*—In the instant case, a suit for specific performance, between a landowner and a railroad, it was claimed by defendant that even if

a letter did constitute a contract between the parties, its terms were too vague and indefinite to be specifically enforced in equity. The letter was not as definite and specific as might be desired, but it was written by a skillful engineer who went upon the property in person, and used language applicable to the peculiar physical conditions as seen and known by all parties in interest, including the uses to be made of the slate quarries along the track, and was sufficiently definite to be enforced in equity.

5. Specific Performance—*Railroad's Right of Way—Relocation—Contract Requiring the Constant Supervision of the Court—Case at Bar.*—In the instant case, a suit for specific performance of a contract between a landowner and a railroad which required the relocation of the right of way, it was objected that a decree requiring the relocation of the track, in accordance with the contract, would require the constant supervision of the court.

*Held:* That when the decree appealed from has been obeyed and the tracks of the company located as therein indicated, there would be no occasion for any further supervision by the chancery court.

6. Appeal and Error—*Specific Performance—Presumption that Parties will Obey Order of Court.*—The Supreme Court of Appeals will not presume that an appellant, submitting its cause to a court of competent jurisdiction, will do other than obey the final order entered therein, and give full effect to the contract between the parties as construed by the court of last resort.

7. Railroads—*Foreclosure Sale of Railroad—Effect on Title to Right of Way—Case at Bar.*—The foreclosure sale of the property of a railroad in no way affected the title of a landowner to land over which an easement of right of way had been granted the railroad, the landowner being no party to the foreclosure proceeding, the purchaser took only the rights enjoyed by the railroad at the time of the sale, assuming at the same time the burdens connected therewith.

8. Railroads—*Purchase of Railroad by Another—Notice—Notice of Officer, Notice to the Corporation—Case at Bar.*—In the instant case, a suit for specific performance, it was contended that even if there was a contract on the part of a railroad and the owners of a quarry, as to a right of way over the quarry, the appellant was a purchaser of the land from the railroad without notice of such contract. The writer of the letter embodying the contract was an officer, both of the appellant and the railroad, and his knowledge of the letter and the agreement which it embodied was imputed to the appellant who was therefore a purchaser with notice and was bound equally with its vendor.

9. Corporations—*Notice—Officers.*—There is no other way of bringing knowledge to a corporation except through its officers and agents; and knowledge acquired by such officers or agents in transactions affecting their business employment must be regarded as actual

knowledge to the corporation. This is especially true when the knowledge thus acquired is obtained by the officer in the discharge of his official duties.

10. FRAUDS, STATUTE OF—*Railroad's Right of Way—Memorandum of Agreement Between Railroad and Landowner.*—A duly authorized memorandum of an agreement as to a railroad's right of way, signed by an agent of the railroad or its predecessor in title, received by the landowner, approved and acted upon by all parties, sufficiently satisfies the statute of frauds.

11. FRAUDS, STATUTE OF—*Memorandum—Signature of Agent.*—In order that a signing by an agent may satisfy the requirements of the statute of frauds, it is necessary and sufficient that the person signing have the capacity to act as an agent and that he possesses lawful authority to sign, either conferred previously and unrevoked at the time of signing, or conferred subsequently by a valid ratification.

12. ADVERSE POSSESSION—*Right of Way—Railroad Entering a Right of Way in Privity with Owners.*—Where a railroad company entered upon the premises of a landowner in privity with the owner, before the railroad can claim the premises by adverse possession, the evidence must point clearly to the time and circumstances under which the privity of the easement was repudiated by the railroad and an adverse claim asserted.

13. ADVERSE POSSESSION—*Possession Begun in Privity with Owner—Disclaimer.*—In questions of adverse possession a higher degree of proof is required where the possession was begun in privity with the opposing claimant than where no such relation existed. Where the possession was originally in privity with the adverse claimant, there must be a clear, positive, and continuous disclaimer and disavowal of the title, and the assertion of an adverse right brought home to the adverse claimant. The possession must become tortious and unlawful by the disloyal acts of the party in possession, so open, notorious, and continued as to show fully and clearly the changed character of his possession, and knowledge thereof to the adverse claimant.

14. RAILROADS—*Contract with Landowner Requiring Relocation of Tracks—Decree Enforcing Contract—Due Process of Law.*—In a suit for specific performance of a contract between a railroad and a landowner, requiring the railroad under certain conditions to relocate its tracks over the landowner's premises, a decree enforcing the contract does not take the railroad's property without due process of law. The decree took nothing from the railroad, but simply required it to perform its obligations in keeping with its agreement or that of its predecessor in title, which was well known to the railroad.

15. RAILROADS—*Relocation of Tracks in Compliance with Contract—Transportation Act—Case at Bar.*—In the instant case, a decree which required a railroad company to relocate its tracks over complainants

quarry land, in compliance with its contract, was not unconstitutional as being in conflict with the act of Congress of February 28, 1920, known as the transportation act. It was one of those inconsequential changes in trackage that does not affect the public, and was never intended to be controlled by the transportation act.

16. Constitutional Law—*Impairment of the Obligation of the Contract—Transportation Act—Case at Bar.*—A decree enforced the obligation of a contract between a railroad company and a quarry owner, and required a relocation of the railroad's tracks, in compliance with the contract. The contractual rights enforced by the decree had their genesis long before the enactment by Congress of the transportation act, and, therefore, that act could have no effect upon the contract between the parties. No law, whether State or national, can be passed impairing that obligation.

17. Railroads—*Relocation of Tracks—Section 4379 of the Code of 1919—Slight Change in Location—Cas.. at Bar.*—Code of 1919, section 4379, in regard to changes of location by railroad companies, has no application to a slight relocation of the tracks of a railroad in compliance with a contract between the railroad and the owner of quarry lands, over which the track passes. There may be changes of location so slightly to the prejudice of any portion of the community as to come within the principle of *de minimis lex non curat.*

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for complainant. Defendant appeals.

*Affirmed.*

The opinion states the case.

*Leake, Leake & Spicer* and *A. L. Pitts, Jr.,* for the appellant.

*S. A. Anderson* and *Arden Howell,* for the appellee.

McLemore, J., delivered the opinion of the court.

This is an appeal from a decree of the Chancery Court of the city of Richmond entered on the 9th day of October, 1923, and as its entry gives rise to all of the questions involved in a decision of the rights of the parties, it is here pres.nted 'n full.

"This cause which has been regularly matured at rules, docketed and set for hearing, came on this day to be heard upon the complainant's bill of complaint and the exhibits therewith, the answer of the defendant thereto and the exhibits therewith, the general replication of the complainant thereto, the complainant's supplemental bill, the answer of the defendant to said supplemental bill, the general replication of the complainant thereto, the depositions taken on behalf of the complainant and on behalf of the defendant and heretofore filed in the clerk's office of this court, and the exhibits returned and filed therewith, and was argued by counsel.

"On consideration whereof, the court doth adjudge, order and decree that the land now occupied by the defendant's railroad tracks and station building at Arvonia, in the county of Buckingham, Virginia, described in the bill of complainant and the exhibits filed in this cause is owned by the plaintiff; that the said land is occupied by the defendant under and by virtue of a certain agreement, the memorial of which is the Whitcomb letter, dated December 26, 1885, being exhibit No. 1 with complainant's bill, and which is in the following words and figures, to-wit:

"Subject

"RICHMOND AND ALLEGHANY R. R. CO.,

"Office of engineer of water power.

"V. Pres. Ref.
"No...................

"Richmond, Va., *December 26, 1885.*
"D. Axtell, *Esq.,*
"*Receiver and Manager*
"I submit the following memorandum of the agree-

ment with Messrs. Williams Bros. for right of way and station privileges at Arvon.

"The Messrs. Williams agree to give free right of way 100 feet wide (fifty feet each side of present centre line) to the Buckingham Railroad through their land near Arvon—and sixty feet additional width for 500 feet for station grounds to be selected by the railroad company hereafter. It being understood that if the location of the road remains at at present this additional strip will be selected on the right or west side of the line as far as practicable from the present quarry. But if the present line is changed so as to put it on the east side of Hunts creek (crossing at or near line of quarry strike) then the station grounds shall be selected by the railroad company on the east side of said creek at a point convenient for business. When the line is so changed the Williams Bros. will give an equivalent right of way to that granted on present location—it being understood that both on the present location or on the changed location the railroad company will only use so much of the 100 feet in crossing any slate vein as is necessary for the construction and safe maintenance of a double track railroad.

"It is further understood that the present location of the station building may be found too near future quarry operations for its safety; but until such is found to be the case the building will be allowed to remain on this temporary location with the privilege of access and the use of about half an acre of ground outside the right of way.

"It is further understood that if the Buckingham railroad is extended more than a mile beyond Arvon before the projected change of line mentioned is rendered necessary by quarry operations—then the

Buckingham Railroad Company will be at all the expense of such change (except for right of way and station lot) but if otherwise then the railroad company will be at the expense of bridges over Hunts creek and of furnishing and laying the tracks and of moving the station buildings; and the Messrs. Williams will do the other necessary grading.

"It is understood that H. E. Nicholas, Esq., and his wife are to join in any release of right of way and gift of station lot.

"Mr. Eggleston will furnish map and description of present line and right of way at Arvon.

<p style="text-align: right">"H. D. WHITCOMB.</p>

"That the present location of said tracks and station building is under the terms of said agreement a temporary location, to be changed when rendered necessary by the quarry operations of the plaintiff; that the quarry operations of the plaintiff have rendered necessary the change of location of said tracks and station building of the defendant; that the defendant is entitled to an *easement* or right of way equivalent to the right of way now occupied by it over and across the lands of the plaintiff at any location to be selected by the defendant at Arvonia one hundred feet wide, fifty feet on each side of the centre line, and sixty feet additional width for five hundred feet for station grounds to be selected by the defendant, with privilege of access and use of about half an acre of ground outside the right of way, provided, however, that the defendant shall only use so much of the one hundred feet in crossing any slate vein as is necessary for the construction and safe maintenance of a double track railroad, and provided, however, that the defendant

shall so locate, use, operate and maintain its railroad tracks and station building as not to interfere with or prevent the plaintiff from quarrying its slate deposits and operating its quarry; that the defendant's railroad having been extended more than a mile beyond Arvonia, formerly known as Arvon, before the change of line mentioned was rendered necessary by the quarry operations of the plaintiff, the said defendant shall be at all the expense of such change, except for right of way and station lot; that the defendant is hereby ordered to perform all of its obligations to the plaintiff set out and stated in said agreement, and that it shall with reasonable dispatch commence the removal of its tracks from the present location, and shall from thence continue such removal until completion, whereupon the defendant shall cease from operating and using its railroad tracks and station building as at present located.

"And hereafter the court will enquire into, consider and determine the damages claimed by the plaintiff, if any."

The Buckingham railroad is a short branch line of some four or five miles extending from Bremo Bluff, a station on the old Richmond and Alleghany Railroad, now the Chesapeake and Ohio, to Arvonia, in Buckingham county, traverses the lands of the appellee and serves the slate quarries on these lands, and other quarries situated around Arvonia. While this was an independent corporation, its operation and management passed to the receivers of Richmond and Alleghany Railroad Company by a lease dated January 1, 1885, and covered a period of forty years. This lease in due course was assigned to, and became the property of the Chesapeake and Ohio Railway Company, by authority of an act of the General Assembly of Virginia of December 18, 1889.

Subsequently, on November 5, 1897, the Chesapeake and Ohio Railway Company purchased all of the stock of the Buckingham Railroad Company, and took a deed for the property.

At the time this quarry branch was projected and during its construction, the land through which it passed, causing this litigation, was owned by John R. and Evan R. Williams, natives of Wales, and experienced slate men. Upon their land was located very valuable slate deposits, some of which had been quarried in a small way before the construction of the quarry branch from Bremo Bluff.

The Williamses were naturally anxious to see a railroad constructed to the quarries, and co-operated with the promoters in bringing about this result. One of the ways in which they aided in its construction was the granting to the Buckingham Railroad Company a right of way across their tract of land of some 250 acres without monetary consideration. We are without information as to the exact conditions under which the easement over the land was first granted—indeed no definite terms seems to have been arrived at until about the last of December, 1885, at which time the result of previous conferences between the Williamses and Decatur Axtell, receiver and manager of Richmond and Alleghany Railroad Company, and H. D. Whitcomb, its engineer, were reduced to writing and constitute what is referred to in the record as the "Whitcomb letter" of December 26, 1885.

Upon the proper construction of the meaning and of the legal effect of this letter depends the final outcome of this litigation.

The appellant in the petition for an appeal assigns ten errors on the part of the chancellor in entering the decree complained of. They will be discussed in their order.

"(1) The 'Whitcomb letter' did not constitute a contract, and, therefore, there can be no specific enforcement thereof.

"(2) The 'Whitcomb letter' was not a memorandum of a previous parol contract by virtue of which entry was made upon the lands of the appellee, and, therefore, not enforceable under the doctrine of *Halsey* v. *Peters,* 79 Va. 60."

[1, 2] The Whitcomb letter is not claimed to be the contract under which appellant took possession of the right of way. It purports to be the reduction to writing of a previous understanding between the parties relative to the terms and conditions under which the Williamses were to donate a right of way through their tract of 250 acres. This is made apparent by reference to Mr. Axtell's letter of January 18, 1886, addressed to J. R. Williams and Company, in which he says: "The enclosed letter (the Whitcomb letter) expresses the purposes we have discussed and the *conclusions reached,* unless I am mistaken. If I am right will you please say so in returning the letter and I will have deeds prepared." (Italics supplied.)

"The whole question is one of intention. If the parties are fully agreed there is a binding contract notwithstanding the fact that a formal contract is to be prepared and signed, but the parties must be fully agreed and must intend the agreement to be binding." *Boisseau* v. *Fuller*, 96 Va. 45, 46, 30 S. E. 457.

This Whitcomb letter was apparently treated by all parties as embodying the agreement previously reached in their conferences which led up to the written memorandum aforesaid.

It will be observed that the Whitcomb letter is not a proposal of terms or conditions as a basis upon which the railroad company is willing to obligate itself, which

would of course require an acceptance in some form to become binding, but its first paragraph recognizes an agreement as existing between the parties. "I submit the following memorandum of *the agreement* with Messrs. Williams Bros. for right of way and station privileges at Arvon." (Italics supplied.)

Again in Mr. Axtell's letter, transmitting the Whitcomb letter to J. R. Williams and Company, he says: "The enclosed letter expresses the purposes we have discussed, and the conclusions reached, unless I am mistaken."

We think therefore that the letter in question was not an offer to negotiate or proposal for acceptance, but a written memorandum of a previous verbal agreement and does not require an acceptance in order to give it the effect which its terms import. The request for the return of the letter was manifestly for the purpose of reducing the agreement to a more formal indenture.

[3] The railroad company was now in possession of the right of way, under the agreement reached in the conferences between the parties, and the Williamses had in their files a copy of the agreement (the Whitcomb letter) as reduced to writing. So the matter rested for some twenty-five years or more. The railroad company all the while knowing that it had no title to the right of way or depot grounds, yet satisfied to operate, as it now contends, under a verbal permission only, given nearly forty years ago, the terms of which no man now living remembers.

This position seems hardly credible, and we have no difficulty in reaching the conclusion reached by the learned chancellor in the court below, that both parties relied upon the Whitcomb letter and recognized it as a memorial of an existing contract between the parties.

This view is strengthened by the fact that in all of the surveys made by the appellant they have shown upon their plats no title to the right of way in question. To the same effect is the plat of the valuation committee of the Interstate Commerce Commission, which was also made by appellant.

When the question of the removal of the tracks was first agitated by the slate company, the railroad company so far from denying the rights of appellee to make this demand had its engineers make sundry surveys looking to a removal of its tracks so as to allow the slate quarry to be worked. Again, if the appellant had acquired title to the right of way it is most remarkable, and unusual, that it would have permitted its right of way to be invaded, and slate quarried to within four feet of its cross ties. Indeed the manner in which this right of way was used and employed by both parties furnishes most convincing evidence that the appellant never asserted ownership over the 100 foot right of way, but enjoyed an easement only, over the property as defined in the Whitcomb letter.

Assignment of error No. 3 is as follows:

[4] "(3) Even if the 'Whitcomb letter' did constitute a contract, its terms are too vague and indefinite to be specifically enforced in equity."

The Whitcomb letter may not be as definite and specific as might be desired, but when we consider that it was written by a skilled engineer who went upon the property in person, and used language applicable to the peculiar physical conditions as seen and known by all parties in interest, including the uses to be made of the slate quarries along the track, we think the letter is sufficiently definite to be enforced in equity. *Virginia Ry. Co.* v. *Avis*, 124 Va. 711, 98 S. E. 638, and *Jones* v. *Gammon*, 140 Va. 604, 125 S. E. 681.

"The description need not be given with such particularity as to make a resort to extrinsic evidence unnecessary. Reasonable certainty is all that is required. Extrinsic proof is allowed in order to apply, not to alter or vary, the written instrument." 36 Cyc. 591; *Preble* v. *Abrahams*, 88 Cal. 245, 26 P. 99, 22 Am. St. Rep. 301.

"That the description of the property in a lease is indefinite will not defeat specific performance of a covenant to renew the lease, *where both parties have without question acted under the lease.*" 36 Cyc. 592. (Italics supplied.)

Assignment of error No. 4 is as follows:

[5, 6] "(4) A court of equity will not specifically enforce a contract requiring the constant supervision of the court, or where the court cannot by its ordinary means and instrumentalities enforce its decree."

The 4th assignment is we think without merit. When the decree appealed from has been obeyed and the tracks of the company located as therein indicated, we see no occasion for any further supervision by the chancery court. This court will not presume that appellant, submitting its cause to a court of competent jurisdiction, will do other than obey the final order entered therein, and give full effect to the contract between the parties as construed by the court of last resort.

Assignment of error No. 5 is as follows:

[7] "(5) Even if the 'Whitcomb letter' did constitute a contract between the receivers and Williamses it was not reported to the Circuit Court of the city of Richmond by the receivers in the chancery cause hereinbefore mentioned, nor authorized by it, and consequently the purchaser under the foreclosure decree took the property free from the obligations thereof."

This assignment is, we think, unsupported by the facts in this cause.

The decree of foreclosure and sale of all of the property of the Richmond and Alleghany Railroad Company entered on December 19, 1888, in no way affected the property of the Williamses who were not parties to the foreclosure proceedings; and as we have already seen, the railroad never had any title to the right of way, and only possessed at the time of the sale such an easement over the Williamses land as is described in the Whitcomb letter, the purchasers taking only such rights as were enjoyed by the Richmond and Alleghany Railroad Company at the time of the sale, assuming at the same time the burdens connected therewith.

The facts here present a different case from that of *Hoard* v. *C. & O. Ry. Co.*, 123 U. S. 222, 8 S. Ct. 74, 31 L. Ed. 130, referred to and relied upon in the brief of appellant.

In that case there was a foreclosure sale under a general mortgage in pursuance of the statutes of West Virginia, and Mr. Justice Miller speaking for the court, said: "The persons who purchased the railroad at the mortgage foreclosure sale did not thereby, under any statute of the State, act of February 1, 1871, session laws, page 91, or any contract of which we are aware, become obliged to pay the debts and perform the obligations of the railroad company."

Assignment of error No. 6 is as follows:

[8] "(6) Even if the 'Whitcomb letter' were a contract, it was a contract on the part of the Buckingham Railroad Company and the Williamses, and the appellant was a purchaser of the land from the Buckingham Railroad Company without notice of any such alleged contract."

It can hardly be successfully maintained that the

Chesapeake and Ohio Railway Company, in acquiring the franchise and other property of the Buckingham Railroad Company, was without knowledge of the Whitcomb letter. Mr. Decatur Axtell who directed the letter to be written and later sent it himself to the Williamses, was both president of the Buckingham Railroad Company, receiver and general manager of the Richmond and Alleghany Railroad Company, and vice-president of the Chesapeake and Ohio Railway Company. Under such a state of facts his knowledge of the Whitcomb letter, and of the agreement which it embodied, is imputed to the appellant who is therefore a purchaser with notice and is bound equally with its vendor.

[9] "There is no other way of bringing knowledge to a corporation except through its officers and agents; and knowledge acquired by such officers or agents in transactions affecting their business employment must be regarded as actual knowledge to the corporation." *Atlantic Trust Co.* v. *Union Trust Co.*, 111 Va. 579, 69 S. E. 977.

This is especially true when the knowledge thus acquired is obtained by the officer in the discharge of his official duties.

The case of *Vicars* v. *Weisiger Clothing Co.*, 121 Va. 679, 93 S. E. 580, cited and relied upon in appellant's brief deals with the rights of a purchaser for value and *without notice*, and is therefore not in conflict with the views above expressed. (Italics supplied.)

Assignment of error No. 7 is as follows:

"(7) Even if the 'Whitcomb letter' were a contract between the Buckingham Railroad Company and the Williamses, it was within the statute of frauds since neither H. D. Whitcomb nor the receivers (*pro hac vice*) were agents of the Buckingham Railroad Company."

[10] Having previously reached the conclusion that a duly authorized memorandum of the agreement had been signed by the agent of appellant or its predecessor in title, received by appellee, approved and acted upon by all parties, we think the case is not within the statute of frauds.

[11] "In order that a signing by an agent may satisfy the requirements of the statute of frauds, it is necessary and sufficient that the person signing have the capacity to act as an agent and that he possess lawful authority to sign, either conferred previously and unrevoked at the time of signing, or conferred subsequently by a valid ratification." 27 Corpus Juris, 293.

Assignment of error No. 8 is as follows:

[12] "(8) The Chesapeake and Ohio Railway Company and its predecessors in title have been in continuous adverse possession of said land since the year 1884 and their possession cannot now be disturbed."

It is conceded that the railroad company entered upon the premises of the Williamses in privity with the owners. When this is the case the evidence must point clearly to the time and circumstances under which the privity of the enjoyment of the easement is repudiated, and the adverse claim is asserted.

We have searched the record in vain for any claim of ownership on the part of the railway company prior to March, 1914. Indeed the letter of George W. Stevens, president, of March 8, 1914, sets up no claim of ownership, and the letter of Vice-President Axtell as of September 19, 1917, in which he makes suggestions looking to a compromise of the differences existing between the parties, has in it nothing from which a repudiation of the appellee's rights can be inferred and an adverse claim set up.

This suit was instituted August 26, 1919, within less than two years after the Axtell letter just referred to.

[13] In *Hulvey* v. *Hulvey*, 92 Va. 132, 23 S. E. 233, the court uses this very pertinent language:

"In questions of adverse possession a higher degree of proof is required where the possession was begun in privity with the opposing claimant than where no such relation existed. Where the possession was originally in privity with the adverse claimant there must be a clear, positive, and continuous disclaimer and disavowal of the title, and the assertion of an adverse right brought home to the adverse claimant. The possession must become tortious and unlawful by the disloyal acts of the party in possession, so open, notorious and continued as to show fully and clearly the changed character of his possession, and knowledge thereof to the adverse claimant." *Creekmur* v. *Creekmur*, 75 Va. 430, and *Stuart* v. *Meade*, 119 Va. 753, 89 S. E. 866.

It seems clear to us that the defense of adverse possession for the statutory period cannot be sustained. The abundance of evidence disproving the claim has been heretofore adverted to in this opinion. The acts of the appellant in dealing with the subject matter being of themselves sufficient.

Assignment of error No. 9 is as follows:

[14] "(9) The decree complained of is inequitable and drastic, not warranted by the law or the evidence, conflicts with the statute of Virginia in such case provided, and is equivalent to a taking of appellant's property without 'due process of law.' "

The discussion of the preceding assignments of error have very clearly indicated our disagreement with the views outlined in the above exceptions. The decree appealed from has taken nothing from the appellant, but simply required it to perform its obligations in keeping with its agreement or that of its predecessor in title, and which was well known to appellant.

[15] "The decree complained of is unconstitutional in that it is in conflict with the act of Congress of February 28, 1920, known as the transportation act." (U. S. Comp. St. Ann. Supp. 1923, sec. 10071¼ et seq.)

This is one of those inconsequential changes in trackage that does not affect the public, and was never intended to be controlled by the transportation act of Congress of February 28, 1920.

[16] It may be argued with considerable force that this line of railroad, extending from the main line to the slate quarries, a distance of some four miles, is a spur track and would come within the provisions of paragraph 22 of the transportation act aforesaid, but whether that be so or not is of small moment in this case, for the court is here called upon to enforce contractural rights between the parties, which rights had their genesis long before the transportation act was born, and no law, whether State or national, can be passed impairing that obligation. Virginia Constitution, section 58.

[17] The Code of Virginia, section 4379, has no application to relocation of the railroad track in a case of this character.

As was said by Saunders, J., in *Southern Railway Company* v. *Commonwealth*, 128 Va. 176, 105 S. E. 65: " * * * but there may be changes of location so slightly to the prejudice of any portion of the community, and on the whole so beneficial to the majority of the public having business at the station, that they will not be regarded as abandonments, but as relocations in the sense insisted upon by the appellant. Particularly would this be true where the changes made are minor changes and the station, if the old site is entirely abandoned, is moved but a negligible distance. Such changes we presume would be allowed by the law,

measurably upon the principle of *de minimis lex non curat.*"

The record is voluminous and the facts in many instances obscure. Able counsel have raised many interesting questions dealing with refined legal distinctions and equitable principles, but the outstanding facts in the case convince us that the decree of the chancellor is based upon sound principles of justice and the same is affirmed.

<div align="right">

*Affirmed.*